IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNDER 28 U.S.C. §2254 - HABEAS RELIEF FOR STATE PRISONERS

| | |
|---|---|
| Prisoner's Name: | Drew Peterson |
| BOP Register #: | 07018-748 |
| Confinement: | United States Penitentiary, Terre Haute 4200 Bureau Rd., Terre Haute, IN 47808 |

---

DREW PETERSON,
           Petitioner

- vs -

T.J. WATSON,
           Complex Warden, USP Terre Haute,
           &
KWAME RAOUL,
           Attorney General, State of Illinois,
           Respondents

Trial Court Case No.: 09 CF 1048
        Hon. J. Edward A. Burmilla Jr.
State Appeals No.: 2017 IL 120331

---

Counsel for Petitioner:
    GREENBERG TRIAL LAWYERS
    Steven A. Greenberg
    53 W. Jackson Blvd. #1260
    Chicago, IL 60604
    (312) 399-2711
    *steve@greenbergCD.com*

    Nicholas V. Burris
    (815) 488-3473
    *nburris312@gmail.com*

---

PETITION FOR WRIT OF HABEAS CORPUS – STATE PRISONER

---

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A. PETITION UNDER RULE 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

   B. STATEMENT OF INCORPORATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   C. PROCURRAL HISTORY & REQUIRED INFO . . .. . . . . . . . . . . . . . . . . . . . . . . .2

II.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    A.    DREW WAS DEPRIVED OF HIS SIXTH AND FOURTEETH
           AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL,
           AS DEFINED IN *STRICKLAND V. WASHINGTON*, WHEN TRIAL
           COUNSEL ELICITED ATTORNEY HARRY SMITH'S TESTIMONY—
           WHICH HAD PREVIOUSLY BEEN RULED INADMISSIBLE, AT THE
           REQUEST OF THE DEFENSE—INCLUDING INCRIMINATING
           HEARSAY STATEMENTS THAT DREW WAS GUILTY OF
           MURDERING KATHLEEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    B.    THE TRIAL COURT ERRED IN ADMITTING HEARSAY
           STATEMENTS INTO EVIDENCE VIA THE FORFEITURE BY
           WRONGDOING DOCTRINE WITHOUT FIRST IDENTIFYING WHAT
           TESTIMONY IT WAS THAT THE WRONGDOING SOUGHT TO AVOID
           AND WITHOUT SUFFICIENT PROOF. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        i.     Well Established Federal Precedent—including *Crawford* and
               *Giles*—Required the Trial Court, Before Applying the Forfeiture by
               Wrongdoing Doctrine, to Identify the Testimony that Defendant
               Purportedly Wished to Avoid; its Failure to do so Denied him a Fair
               Trial and Constitutes Reversible Error. . . . . . . . . . . . . . . . . . . . . .22

        ii.    The Prosecution Did Not Present Sufficient Evidence That Drew
               Peterson Killed Kathleen Savio or Stacy Peterson with the Intent of
               Making Them Unavailable as Witnesses. . . . . . . . . . . . . . . . . . 25

     **C.**   THE ILLINOIS SUPREME COURT'S EXCEPTION—THAT
           COMMUNICATIONS BETWEEN A LAYPERSON AND AN
           ATTORNEY, DURING WHICH THE ATTORNEY PROVIDES LEGAL
           ADVICE, ARE NOT PROTECTED BY ATTORNEY-CLIENT PRIVILEGE
           IF THE ATTORNEY IS NOT GOING TO BE ABLE TO ENTER INTO

FORMAL REPRESENTATION—IS AN UNWARRANTED DISTORTION OF THE LAW OF PRIVILEGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

    i.      The Decisions is a Departure from Well Settled Precedent . . . . . . .29

    ii.     The Decision Ignores the Purpose of the Privilege. . . . . . . . . . . . .33

CONCLUSION AND PRAYER FOR RELEIF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

# I. INTRODUCTION

Drew Peterson was tried before a jury in Will County, Illinois. He was convicted of First Degree Murder and sentenced to 38 years imprisonment by the trial court. His conviction was affirmed by the appellate courts of the State of Illinois. *People v. Peterson*, 2017 IL 120331 (Ex. A); *People v. Pet*erson, 2015 IL App (3d) 130157 (Ex. B). He petitioned for a Writ of Certiorari, but was denied by the Supreme Court on October 1, 2018. *Peterson v. Illinois*, 139 S. Ct. 177 (2018). Accordingly, he has exhausted his state remedies and this Petition is being timely filed.

## A. PETITION FOR WRIT OF HABEAS CORPUS UNDER §2254

The Petitioner, DREW PETERSON, through his undersigned counsel, respectfully Petitions this Court to issue a Writ of Habeas Corpus. This Court has jurisdiction over this Petition pursuant to 28 U.S.C. §2254, as the Petitioner is in custody on the judgment of a state court and has exhausted all remedies available to him within the courts of that State. This Petition consists of substantial and significant constitutional violations that occurred leading up to, and during, his trial—these violations, as are laid out throughout this Petition, mandate a Writ. Petitioner requests discovery, an evidentiary hearing, and all appropriate relief from this unconstitutional conviction, including the unconditional discharge of his confinement on these charges. All avenues of State review have been exhausted.

## B. STATEMENT OF INCORPORATION

All facts pled herein go to all claims, and all assertions, facts, legal arguments, and authority of law previously pled by Petitioner, whether to this Court or any other, are incorporated by reference here made. For all of the reasons pled within, Petitioner is entitled to his release on these charges, as well as a new trial, in the interest of justice.

## C. PROCEDURAL HISTORY AND REQUIRED INFORMATION

Drew Peterson ("Drew"), on conviction from Illinois State charges, is in the custody of the Federal Bureau of Prison's at United States Penitentiary, Terre Haute in Terre Haute, Indiana. His Bureau of Prisons number is 07018-7481. His date of birth is January 5, 1954. This Petition arises from Mr. Peterson's conviction for the First-Degree Murder of Kathleen Salvio ("Kathleen") in Will County, Illinois. The conviction and attendant rulings are contrary to established federal law and based upon unreasonable determinations of fact. Any error was not remedied by the state courts of review, and given the unquestionable lack of evidence, a writ ought be granted..

## II. FACTS

In a jury trial in the Circuit Court of Will County, Petitioner was found guilty of the first-degree murder of his former wife, Kathleen Savio, and sentenced to 38 years imprisonment.

On Sunday, March 1, 2004 around 10:30 p.m., Kathleen was found dead in a bathtub in her home. Investigators found no signs of foul play at the scene, concluding that Savio had slipped and fallen in the bathtub. An autopsy found her death was an accidental drowning. The Will County State's Attorney Office concurred with the findings and closed the file on Savio's accidental death.

Two years before her death, in early 2002, Savio and Peterson had separated after a breakdown of their marriage. (Ex. E, 835). A few months later, on July 18, 2002, Kathleen contacted Bolingbrook Police Department Lieutenant Kernc, complaining that she was angry with Drew for having a battery complaint filed against her in the name of Drew's then-girlfriend Stacy Ann Cales ("Stacy"). (Ex. E, 2708). Kathleen provided a story in which she alleged that two weeks prior, Drew had broken into her home, pushed her down the stairs, pulled out a knife, and threatened her life—only to then leave, throwing down the garage door opener he had allegedly used to enter while stating he "couldn't hurt [her]." (Ex. E, 2678-2680). When asked to formalize this allegation in writing, Kathleen omitted any mention of the knife. Upon being instructed by the Lieutenant to include the knife in her complaint against Drew, she did so, only to then scratch out that portion. (Ex. E, 2675). Drew was not prosecuted.

By October of 2003, Kathleen and Drew had agreed to a bifurcated divorce proceeding, wherein their marriage was dissolved but the division of their marital

estate was left to be decided at a future date.[1]  Drew married a pregnant Stacy soon after.

On Saturday, February 27, 2004, Drew picked up his and Kathleen's children for his regularly scheduled weekend visitation.  Kathleen then went out for the night with her boyfriend, the couple did not part ways until after breakfast on Saturday.  (Ex. E, 848-49).  After, no one, including her boyfriend, had any contact with Kathleen, on Sunday or Monday.  (Ex. E, 854-56).  Sunday, when Drew had attempted to bring the kids back to Kathleen's there was no response at the door.  He brought the kids back to his house, and after work he stopped by again, but there still was no answer. (R. 856).

That Monday, Drew continued trying to reach Kathleen, to no avail.  In the evening, he contacted the Pontarelli's to accompany him inside the home.  (Ex. E, 857).  They did so along with a second neighbor, Steve Carcerano, and a locksmith— since Drew no longer had a key to the home. (R. 858-59).  Around 10:30 p.m., Carcerano and Pontarelli discovered Kathleen's body in the master bathtub.  (Ex. E, 867).  When Drew saw Kathleen he knelt over her to check her pulse; she was dead.  (Ex. E, 870).  Drew, who these witnesses described as visibly shaken, called the police.  (Ex. E, 870).  He then went home to tell his sons, Thomas and Kristopher, about their mother.  (Ex. E, 4800-01).  Thomas testified that Drew was "really upset" about Kathleen's death.  (Ex. E, 4801-02).

---

[1] Because they divorced prior to Kathleen's death, the death had no effect on the property distribution in their divorce proceedings.  750 ILCS 5/503, et seq.  Accordingly, the distribution of their marital property proceeded as if she was still alive.

About 45 minutes later Will County Coroner Michael Van Over arrived on the scene and examined the body—finding it to be "cool to the touch" with clear signs of lividity and slight rigor mortis. (Ex. E, 1449; 1453). A Bolingbrook officer then informed Van Over that the investigation would be handled by the Illinois State Police ("ISP"). (Ex. E, 1458-59).

ISP Evidence Technician Bob Deel arrived at the home around 1:30 a.m. (Ex. E, 1460). Deel canvassed the home along with two ISP troopers, Bryan Falat and Patrick Collins. Nothing suspicious or out of the ordinary was discovered inside or outside of the home. (Ex. E, 1538-39). Neither Deel, nor those assisting him, located any sign of disturbance, struggle, defensive wounds, markings, or other similar evidence. (Ex. E, 1538-39; 1735-37).

While Van Over and Deel photographed Kathleen, Trooper Falat conducted a walk-through of the house, basement, and garage. (Ex. E, 3671-75). He found orange juice and pills sitting on the kitchen counter, and a mug of tea in the microwave—but these items were never processed. (Ex. E, 3670). Falat testified that he did not check the basement windows, even if only to see if they were locked, or preserve potential fingerprint evidence. (Ex. E, 3672). The entire home was never dusted for fingerprints. (Ex. E, 3674). Remarkably, while Falat located a used condom in the bathroom waste basket, he failed to collect or inventory it. (Ex. E, 3674; 3704-07). When the investigators left, the scene was unsecured. (Ex. E, 3674-75). The reasoning for the lack of any detailed investigation was because, as

Van Over wrote, "it was felt at the time by all parties that there were no signs of any foul play or trauma for this death investigation." (Ex. E, 1492).

Bryan Mitchell, M.D., conducted Kathleen's autopsy. Not finding any signs of trauma, while concluding her death was due to drowning, he opined the manner of death was an accident. Dr. Mitchell passed away prior to trial.

On the same day as the autopsy, Collins and Falat interviewed Drew at the Bolingbrook Police Department. He was forthcoming when asked questions regarding Kathleen's death, explaining that he spent Saturday at home with his children. The following day, Collins and Falat interrogated Stacy Peterson, who did not provide any information that inculpated Drew. Upon inquest before a Will County Coroner's jury, Kathleen's manner of death was ruled an accident.

More than three years later, on August 30, 2007, Stacy called Reverend Neil Schori, who had previously counseled Drew and Stacy. Ex. 3918- 3935. The two arranged a meeting at a coffee shop in Bolingbrook, where, according to the Reverend, Stacy appeared to be nervous, withdrawn, and crying. Stacy told Schori how one time she had awoke to find Drew was not in bed, or home when she checked the house for him. Later, in the early morning hours, she saw Drew standing by the washer and drier dressed in all black, dumping women's clothes from a duffel bag into the washer (not her clothes). Stacy continued, telling Schori that Drew told her that the police would be coming talk to her, telling her what to say. Finally, Stacy explained that Peterson—who served in the U.S. Army as a military policeman in Washington D.C.—"killed all his men" while in the service.

Schori testified this conversation lasted about 90 minutes, that he thought she may have been lying at the time, and that he did not follow-up on her statements in any way. It it is clear that Schori—the sole source of this information—did not take story seriously, as he did not recommend any means of recourse, shelter, or help to Stacy.  Ex. E, 3934.

Less than two months later, on October 24, 2007, Stacy contacted attorney Harry Smith—to ask him to possibly be her divorce attorney if she filed for a divorce from Drew.  Stacy reportedly inquired if she would benefit in the divorce matter if she accused Drew of killing Kathleen.

Sometime later, Stacy's sister reported her missing—generating immediate and enormous media interest.   In November of 2007, Drew sought legal counsel and retained Joel Brodsky to represent him.[2]  Instead of advising Drew to remain silent or to assist/comply with the investigation, Brodsky devised a "joint media agreement" in which he (Brodsky) would receive 85% of all proceeds from an array of harmful public appearances.  These public interviews, that Brodsky organized and directly profited from, were later introduced as evidence by the prosecution at trial.

In the wake of this extensive media coverage, which touched upon both Kathleen's death and Stacy's disappearance, a number of stories emerged from those who knew both.

---

[2] Brodsky has since been suspended from practice. See *In re Joel Alan Brodsky, M.R. 029865, located at:*  *https://www.iardc.org/ldetail.asp?id=587160064*

Mary Sue Parks, who attended the same community college where Kathleen was studying to be a nurse, came forward and told investigators that in 2003, while at school, Kathleen had shown her three red marks on her neck. According to Parks, Kathleen claimed that Drew had snuck into her home, grabbed her by the neck, pinned her down, and said "why don't you just die." Parks also stated Kathleen told her Drew said "he could kill her and make her disappear." (Ex. E, 2030-67). Parks claimed she offered to take in Kathleen and the kids, but Kathleen declined. But Parks conceded on cross-examination that she could not possibly have been with Kathleen when this alleged conversation took place—as Parks was not then enrolled at the school. (Ex. E, 2072). Additionally, Mary Pontarelli, Kathleen's best friend and neighbor, testified that she never once saw signs or marks of physical abuse on Kathleen.

Kristin Anderson, who was living in Kathleen's basement with her own family, from September to November 2003, explained that either her or her husband would have been home for the event described by Parks, but neither recalled witnessing any such conversation or event. (Ex. E, 1969-2009). While Anderson did testify that Kathleen had told her about the 2002 alleged break-in that Kathleen had reported to Lt. Kernc, she also said she had reported this to the Illinois State Police when she learned of Kathleen's death. There was no record of any report found by ISP. (Ex. E, 1962).

Will County convened a special grand jury to investigate Stacy's disappearance and Kathleen's death. The Coroner's Office contacted Larry Blum,

M.D., to review Dr. Mitchell's autopsy report of Kathleen. (Ex. E, 2762). On November 13, 2007, Dr. Blum proceeded with a second autopsy on Kathleen's exhumed body. Dr. Blum noted "a lot of water in the casket . . . and marked deterioration of the tissues of the body." (Ex. E, 2788). X-rays were taken that Dr. Blum found to be "largely unremarkable," while noting deep bruising over the left lower quadrant of Kathleen's body and bruising on the left breast. Dr. Blum found no evidence of hemorrhaging in Kathleen's neck or back. He reviewed the toxicology report and concluded that Kathleen had no drugs in her system at the time of her death. Nonetheless, Dr. Blum eventually opined Kathleen's manner of death to be homicide. (Ex. E, 2912). The Grand Jury indicted Drew on charges of First-Degree Murder.

Between January 19, 2010 and February 19, 2010, the court held a six-week preliminary hearing ("hearsay hearing") pursuant to the State's Motion to Admit Certain Hearsay Statements in accordance with Illinois' Forfeiture-by-Wrongdoing ("FBW") statute and common law. *725 ILCS 5/115-10.6*. In ruling on this Motion, the Circuit Court held that the prosecution had proved by a preponderance of the evidence that Drew had killed both Kathleen and Stacy; however, as is substantially significant this to Petition, the court never made a finding—or even suggested—what testimony Drew was attempting to avoid via killing his past-wives. The court simply, and generally, found that Drew had killed Kathleen and Stacy to keep them from being witnesses. The court admitted eight hearsay

statements, while precluding others as unreliable. ("Drew's Law" required an additional finding of reliability, whereas common law FBW did not.). Ex. D.

Despite lobbying for the enactment of this very statute, Drew's Law, for the purpose of this very prosecution (of Drew), the State filed an interlocutory appeal with regard to the court's hearsay ruling—arguing that all of the offered statements were admissible, regardless of reliability, under common law FBW. Initially, the Appellate Court denied the appeal as untimely. *People v. Peterson*, 2011 IL App (3d) 100513. The Illinois Supreme Court then ordered them to consider the issue. On remand, the Third District ruled that the statute violated the separation of powers doctrine in Illinois, and ordered all of the hearsay admissible. *People v. Peterson*, 2012 Ill. App (3d) 100514-B. Ex. F.

At the subsequent trial, the prosecution did not present a single piece of physical evidence—direct or circumstantial—linking Drew to Kathleen's death; nor did it present any testimony placing Drew at or near the home between February 28 and March 1, 2004. There was no direct admission. Drew did not testify at trial.

Instead, theorizing that Drew drowned Kathleen, the prosecution relied heavily upon the FBW testimony, and the defense-admitted testimony of attorney Harry Smith. After being barred by the court from testifying in the prosecution's case, Smith was inexplicably called at the close of the defense's case to testify Stacy told him Drew murdered Kathleen and she knew how (Meaning Drew either confessed to her or she assisted him). Ex. C.

Drew was convicted of first-degree murder on September 6, 2012. The court denied his post-trial motion from the bench and sentenced Drew to 38 years imprisonment in the Illinois Department of Corrections, on February 21, 2013.[3] He has since been transferred to the custody of the Federal Bureau of Prisons for security reasons and remains an inmate.

Mr. Peterson, over the course of the past near-half-decade, has exhausted all means of State review—first filing a timely appeal to the Third District Court of Appeals, who affirmed the conviction. *People v. Peterson*, 2015 Ill. App (3d) 130157. The Illinois Supreme Court also affirmed the conviction. *People v. Peterson*, 2017 IL 120331. Drew's *Petition for a Writ of Certiorari*, was denied on October 1, 2018. *Peterson v. Illinois*, 139 S. Ct. 177 (2018). Drew now petitions this Court for a *Writ of Habeas Corpus*, alleging specific constitutional violations that occurred leading up to and during his trial, thereby depriving him of his constitutional right to effective counsel and a fair trial.

### III. ARGUMENT

### STANDARD OF REVIEW

---

[3] Mr. Peterson also stands convicted of Solicitation of Murder and Solicitation of Murder for Hire. He was sentenced to 40 years in the Illinois Department of Corrections on those charges, to be served consecutive to his 38-year murder sentence. That matter is on the first stage of direct appeal.

The standard of review governing a Habeas Petition under §2254 is defined within the same statute. As the statute provides in subsection (d), "an application . . . shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceeds unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law . . . or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

In elaborating upon this standard, Justice Breyer wrote "[t]his is a straight forward inquiry, when the last court [ . . . ] explains its decision on the merits in a reasoned opinion . . . [a] federal habeas court simply reviews the specific reasons given by the State court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). However, where the "last court" simply affirms or denies a lower court's reasoning, the federal habeas court looks to the reasonableness of the lower court's rationale in ruling on the writ. *Id*.

**A. DREW WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, AS DEFINED IN *STRICKLAND V. WASHINGTON*, WHEN TRIAL COUNSEL HAD ATTORNEY HARRY SMITH TESTIFY ABOUT INCRIMINATING HEARSAY STATEMENTS THAT DREW WAS GUILTY OF MURDERING KATHLEEN**.

At trial, the defense called attorney Harry Smith who testified that Stacy Peterson, Drew's then missing wife, had called him and told him Drew murdered

Kathleen, and she knew how.[4]  Defense counsel intentionally presented what was akin to a confession in conclusory form.  It was obviously ineffective, on the Mount Rushmore of boneheaded moves.

Still, in the face of the complete absence of any strategic reason, as well as overwhelming and uncontradicted law crying out for reversal, the Illinois courts found no error.  First, the appellate court ignored the "objectively unreasonable prong" of the *Strickland* analysis before the Illinois Supreme Court dispensed with logic and common sense, concluding that counsel was not ineffective, but merely offered reasonable strategy that was "proved unsuccessful."  *Id.* at ¶ 88. They ignored that this is an adversarial process—the most damaging evidence in a criminal case is not supposed to be *intentionally* offered by the defense.  Here, by failing to correctly apply *Strickland* to assess the ineffective-assistance-of-counsel claim raised, the state court's adjudication was contrary to clearly established federal law.

The label "trial strategy" is not a catch-all to justify *any* courtroom tactics:

> As this Court has previously recognized, "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel." *Lovett v. Foltz,* 884 F.2d 579, 1989 WL 101522, at *4 (6th Cir.1989) (per curiam) (unpublished). "[E]ven deliberate trial tactics may constitute ineffective assistance of counsel if they fall 'outside the wide range of professionally competent assistance.' *784 " Martin v. Rose,* 744 F.2d 1245, 1249 (6th Cir.1984) (internal citation omitted).  *Manley v. Ross Corr. Inst.,* 314 F. App'x 776, 783–84 (6th Cir. 2008).

---

[4] The entirety of the testimony is found in Ex. C.

13

Unquestionably, the approach of calling a witness to offer the most damaging testimony falls outside even the widest of range of competence. Conscious of that, the trial court opined, in considering a request for a directed verdict at the close of all evidence, "**I will say that it is unusual . . . that the information of how he killed her came from the very last witness called by the defendant in the case**." (Ex. E, 5139).

Smith's predictable testimony was a catastrophe at best. He began with "[Stacy] wanted to leave the state with the children," and "she had information regarding Kathleen Peterson she wanted to use." (Ex. C, 10). It grew even worse when Smith offered an array of harmful information that was otherwise far from admissible. Defense Counsel asked Smith whether he'd previously testified under oath to the following:

- That Stacy had asked him, "could we get more money out of Drew if we threatened to tell the police about how he killed Kathy." (Ex. C, 20);

- That Stacy said she "had so much s-h-i-t on him [Drew] at the police department that he couldn't do anything to her." (Ex. C, 21-22);

- "[Stacy] asked me if we could get more money out of Drew if we tell the police how he killed Kathy." (Ex. C, 23); and

- How "she said she wanted to say he killed Kathy." (Ex. C, 23).

The prosecution quickly reinforced the damning parts of Brodsky's examination:

- That Stacy had too much s*** on Drew for Drew to do anything to her; and

- That she wanted to know if she could get more money from Drew if she threatened to tell the police about "how he killed Kathy."

They also added others through the door kicked wide open by the inexplicable questioning:

- That Stacy said Drew was furious with Stacy because he thought she had told his son that he had killed Kathleen;

- That Drew was conducting surveillance on Stacy and following her;

- That Stacy specifically used the word "how" to indicate that she knew how Drew killed Kathy;

- That Drew was talking to Stacy from another room and ". . . asked her what she was doing and who she was talking to, I believe."

(Ex. C, 38-45).[5]

All of this testimony was known to counsel from the pretrial proceedings. In fact, counsel had Smith reaffirm his grand jury testimony (Beginning most questions with "did you tell the grand jury, under oath…"). (Ex. C, 4-24).

The only logical inference to be had from Smith: Stacy was either an eyewitness or Drew had confessed to her.

---

[5] To be sure, had she been personally present on the stand, Stacy would have never been able to testify, "Drew killed Kathy and I know how" only to then disembark. Plainly, absent facts, foundation, and personal knowledge, the statements were wholly inadmissible. As presented, the testimony could not support a finding "that the witness has personal knowledge of the matter." IRE 602 (identical to former FRE 602). Although personal knowledge may include inferences, the inferences "must be grounded in observation or other first-hand personal experience" and cannot simply be "flights of fancy, speculation, hunches, intuitions, or rumors . . ." *Visser v. Packer Eng'g Assocs. Inc.,* 924 F. 3d 953, 963 (7th Cir.); *Marfia v. T.C. ZIraat Banaski*, 874 F. Supp. 560, 563 (S.D.N.Y. 1994) (vacated on other grounds) ("a witness has personal knowledge if he or she testifies from general observation and knowledge and not upon conjecture.")

The function of the Sixth Amendment is to provide the accused with adversarial process:

> [T]he adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted -- even if defense counsel may have made demonstrable errors -- the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*United States v. Cronic*, 466 U.S. 648, 656-57 (1984) (internal citations omitted) (citing *Anders v. California*, 386 U.S. 738, 743 (1967)).

Every criminal defendant is guaranteed the right to "effective assistance of competent counsel." *McMann v. Richardson*, 397 U.S. 759 (1970); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court held that in order to succeed, the defendant must prove (1) that his counsel's performance was deficient by having made errors so serious that counsel was not function as the "counsel" guaranteed to the defendant by the Sixth Amendment, and (2) that these deficiencies caused prejudice to the defendant. *Strickland*, 466 U.S. at 687.

A trial strategy is unsound when, as here, no reasonably effective criminal defense attorney, facing similar circumstances, would pursue the strategy. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

Here, counsel elicited the strongest evidence of Drew's guilt, at the end of the Defense's case. It is difficult to imagine a greater abandonment of the adversarial process than intentionally producing the best evidence to support the adversary's

case. *See Rickman v. Bell*, 131 F.3d 1150, 1159 (6th Cir. 1997) ("[Defense counsel's] behavior cannot be characterized as legitimate trial strategy; no rational individual could think that painting a picture of one's client even more frightening than the prosecution could paint, would do anything other than doom the client."). "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (White, J., dissenting)).

Before the Illinois Appellate Court, the prosecution was unable to produce a single case to suggest that Brodsky's decision to call Smith in any way reflected sound trial strategy. Undeterred, the Appellate Court abandoned the "objectively unreasonable" prong of the Strickland analysis, writing that as long as counsel's decision could be characterized as "strategic," he provided constitutionally adequate representation. *Supra* at ¶224. Of course, all decisions are somehow subjectively strategic, meaning there must be some reason for the decision. That does not then make the decision objectively reasonable.

The Illinois Supreme Court first looked to the trial court's reasoning in denying the post-trial motion. *Peterson*, 2017 IL 120331 at ¶86 ("'Was it more important to show and destroy Stacy's testimony by the fact she was willing to commit a felony to get at the defendant, to threaten him, to get money from him as opposed to the counter weight of the statement of how he had killed Kathy.*** I

cannot say that demonstrating that Stacy was an avaricious extortionist willing to commit a felony was not in some circumstance a conceivably sound strategy.").  It inconceivably concluded, that the decision to call Smith was "within the realm of trial strategy."  *Peterson*, at ¶88.  The court reasoned, solely, that the strategy to discredit Stacy for asking her attorney if she could extort money from Drew—in a direct exchange for the only admission of guilt from Drew—was a sufficient strategy.  *Id*. at 88.  That makes no sense.  Absent the admission, there was no need to discredit her.

The testimony obviously hurt defendant's position, as Stacy, according to their respective testimonies, revealed far more harmful information to Smith than she did to Schori.  As related above, Schori testified that Stacy told him that she had seen Drew in the early morning hours post-night-of, dressed in black, dumping unfamiliar women's clothes from a duffel bag into their washer; and further, that Drew had coached her to lie (notably, the prosecution never established or argued what that lie may have been). *Id*. at ¶121.  Smith's testimony added both: (1) a direct accusation by Stacy that defendant killed Kathleen, as opposed to circumstantial evidence; and further (2) knowledge-that she knew how Drew killed Kathleen.

Beyond that, because defendant himself had called Smith to testify, as opposed to calling Schori, the jury far more likely believed Smith's testimony to be true—after all, it was offered by the defendant at the close of his case.  The mere manner of presenting damning evidence through direct examination at the close of

18

the defendant's case-in-chief is flagrantly prejudicial. *Manley*, 314 F. App'x. at 787. Presenting the jury with this information at this time for such a far-fetched and trivial purpose was absolutely irredeemable.

Lastly, and most significantly, even if Stacy had a financial motive to lie to her divorce attorney, how would that have impeached her confidential communications with her pastor? It makes no sense, whatsoever, and a reasonable defense attorney would never have made this decision—the inquiry is no more complicated than that.

The decision is also inconsistent with the holding in *McCoy v. Louisiana*, 200 L. Ed. 821 (U.S. 2018). "With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *McCoy*, 200 L.Ed.2d at 827. Calling a defense witness to say they know the defendant is guilty is no different than counsel saying it during argument.

Finding this purported strategy to be reasonable was clearly based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. As such, the conviction must be reversed, and Drew released.


**B. THE TRIAL COURT ERRED IN ADMITTING HEARSAY STATEMENTS INTO EVIDENCE VIA THE FORFEITURE BY WRONGDOING DOCTRINE WITHOUT FIRST IDENTIFYING**

**WHAT TESTIMONY IT WAS THAT THE WRONGDOING SOUGHT TO AVOID AND WITHOUT SUFFICIENT PROOF.**

In this case, the Circuit Court abused its discretion in finding the prosecution proved that Drew killed both Kathleen and Stacy with the intent of making them unavailable to testify. On interlocutory appeal, the Appellate Court erred in not requiring the testimony be identified, as did the Illinois Supreme Court. Both misapplied well-established federal law—the forfeiture by wrongdoing doctrine—in affirming.

The hearsay admitted was central to the prosecution's case. The statements included the letters Kathleen wrote to the Will County State's Attorney's Office describing how Drew had broken into her house and threatened her; a second handwritten statement she wrote describing the same incident; alleged statements to her sisters that Drew was going to kill her and make it look like an accident and she would not make it to the divorce settlement, let alone receive any part of his pension; a statement to Mary Sue Parks describing how Drew broke into her residence, grabbing her by the throat and said "why don't you just die"; a statement to Mary Sue Parks that Drew could kill her and no one would know; and Stacy's statement to Reverend Schori that Drew went out on the night Kathleen was killed, washed women's clothing that she did recognize, told her what to say to the police, and that she lied on Drew's behalf. (Ex. D). Each of these statements was introduced at trial.

The State knew these statements to be highly prejudicial to Drew, considering it opened its closing argument at trial with:

"I am going to kill you. You are not going to make it to the divorce settlement."

"You are not going to get the pension."

"You are not going to get the kids."

Repeatedly in its argument, the State cited Kathleen's statements to others as evidence of guilt. These hearsay statements lay at the heart of the State's case, their erroneous admission was accordingly damning. These statements became the lynchpin of the prosecution's case against Drew, their erroneous admission plainly and fatally deprived him of his constitutional right to a fair trial; therefore, his conviction must be overturned, and he be released.

      i.     **Well Established Federal Precedent—including *Crawford* and *Giles*—Required the Trial Court, Before Applying the Forfeiture by Wrongdoing Doctrine, to Identify the Testimony that Defendant Purportedly Wished to Avoid; its Failure to do so Denied Him a Fair Trial and Constitutes Reversible Error.**

The Supreme Court of the United States made clear in *Giles v. California*, that the forfeiture by wrongdoing doctrine only applies when the defendant "designed to prevent the witness from testifying." *Giles*, 554 U.S. 353, 360 (2008). The United States Supreme Court required that an unconfronted hearsay statement could not be admitted without a finding that the defendant intended to prevent the witness from testifying in a proceeding.

Put another way, the defendant must affect the wrongdoing against the witness with the specific attendant intent of preventing the witness from testifying at a given proceeding. Here, the trial court never found Drew's actions were "designed to prevent the witness from testifying," meaning its decision to admit

21

these statements under the FBW doctrine was patently erroneous. These statements formed the crux of the prosecution's case, and as such, their erroneous admission mandates that the conviction be overturned.

Most cogent here is *Jensen v. Schwochert*, where a federal district court granted in this circuit a habeas corpus petition based upon analogous reasoning to what is argued here. *Jensen*, 2013 WL 6708767, aff'd *Jensen v. Clements*, 800 F. 3d 892, 894-895 (7th Cir. 2015). Like in the case at bar, the parties were in a messy divorce. There, the deceased told others if she died it was because her husband had killed her, and that she feared him. She spoke with, and even wrote a letter to the police. When found, her death was originally ruled a suicide. Prior to the now-well-settled decision in *Giles*, the Wisconsin Supreme Court had determined, as the trial court erroneously decided against Peterson here, that if a defendant caused the absence of a witness for any reason, the FBW doctrine would apply. *Id*.

The Seventh Circuit Court of Appeals affirmed the District Court's granting of Jensen's *habeas* petition, holding both that the FBW doctrine was inapplicable and that the erroneous use of the doctrine at trial was reversible error:

> Julie Jensen's handwritten letter to the police was "a make or break issue,' an "essential component of the state's case," and of "extraordinary value" to the "central issue in this case." Those are not the court's words, but the words of the State, as it fought for the admission of the letter before it placed Mark Jensen on trial for his wife Julie's murder. The State maintained at trial that Jensen killed his wife and framed it to look like suicide. Jensen's defense was that his wife, depressed, unhappy in marriage, committed suicide and made it look like her husband killed her. A key piece of evidence at trial was Julie's handwritten letter to the police, written two weeks before her death, in which she wrote that she would

22

> never take her life and that her husband should be the suspect if anything should happen to her.

*Jensen v. Clements*, 800 F. 3d 892, 894-895 (7th Cir. 2015).

> As a later-decided United States Supreme Court case, Giles v. California [citation omitted], made clear, this letter and other accusatory statements she made to police in the weeks before her death regarding her husband should never have been introduced at trial. *Id*.

The court reiterated language from *Giles*, holding that the FBW doctrine "applies only if the defendant has in mind the particular purpose of making the witness unavailable" to testify. *Id*. at 899.

In *Jensen*, the inference that the accused may have wished to "avoid a messy divorce" was not directly relevant. Finding the trial court's error to be critical, the Seventh Circuit stressed, "the prosecution's choice to end its closing argument with the [testimonial hearsay] reflects its importance in the prosecution's case [ . . .]. No other piece of evidence had the emotional and dramatic impact as did this "letter from the grave." *Id*. at 905. The court concluded that, because the jury improperly heard the victims unconfronted accusations "from the grave" that "there is no doubt that [defendant]'s rights under the Federal Confrontation Clause were violated." *Id*.

Here, the trial court never identified the testimony that Drew was attempting to prevent by allegedly killing Kathleen and/or Stacy. The record is silent. As to Stacy, there was no matter pending against or involving Drew or Stacy at the time of her disappearance. Accordingly, it would be logically impossible to

believe that she was killed in order to prevent her testimony in a non-existent legal proceeding (divorce was pending at the time of Kathleen's death).

The Illinois Supreme Court agreed that the wrongdoing had to be designed to prevent future testimony but disagreed that a specific finding was required as to what testimony the accused intended to avoid. *Id*. That is a misapplication of clearly established federal law. Equally important, its affirmation that the wrongdoing was designed to prevent testimony is unsupported by the evidence presented and its attendant circumstances.

### ii. The Prosecution Did Not Present Sufficient Evidence that Drew Peterson Killed Kathleen Savio or Stacy Peterson with the Intent of Making Them Unavailable as Witnesses.

In viewing this matter within the framework of *Giles* and *Jensen*, the trial court plainly abused its discretion by not finding that the prosecution put forth sufficient evidence. Indeed, the prosecution endeavored to prove that Drew was the perpetrator, but it largely glossed over his motive for doing so—wholly failing to demonstrate why Drew would have wished to avoid this unidentified testimony from either Kathleen or Stacy. The motive for Kathleen was he did not wish to share his pension, and for Stacy none was offered. While the prosecution may not need to prove a motive at trial in order to gain a conviction, the FBW doctrine plainly provides that the perpetrator's motive - specifically, to prevent testimony - must be established.

Instead, after attempting to pick apart the defense argument, the Illinois Supreme Court merely took a brazenly deferential stance, holding: "[b]ased on our

careful review of the evidence presented at the pretrial hearing, and mindful that the State's burden was a preponderance of the evidence, we cannot say that the trial court's finding that the State proved that defendant murdered Kathleen to prevent her from testifying was 'unreasonable, arbitrary, or not based on the evidence presented," quoting *People v. DeLeon*, 227 Ill. 2d 322, 332 (2008). The evidence presented that was 'carefully reviewed' by the Supreme Court included, "that because Kathleen was silenced, the financial and custody issues pending [in their divorce] were decided in defendant's favor [including custody, proceeds from the marital home, and a small-business];" testimony from Harry Smith that "because Kathleen died, a trust fund for the two boys was set up with the proceeds from an insurance policy . . . which exceeded $1 million [to which Drew was named trustee];" and testimony from Harry Smith that "had Kathleen not died, educational, medical, and, other expenses for Kathleen's and [Drew]'s two sons would have been shared by the parties" [i.e. from which Drew would have benefited financially]. Notably, the court failed to identify or even allude to what Kathleen could have possibly testified that would have affected any of this. The court seemed to focus, rather, on how Drew benefited from Kathleen's death, rather than from her lack of testimony. *Peterson*, 2017 IL 120331 ¶48, 51. This evidence, a motive to kill for financial gain is in no way the same as killing someone to prevent their testimony. See *Jensen*.

As to Stacy, the State posited three independent, alternative specific intents, as to why Drew would have killed Stacy to prevent her future testimony. First, to

prevent her from reporting his alleged involvement in Kathleen's death; second, to prevent her testimony in a non-existent and highly speculative divorce proceeding; or third, to prevent her from testifying at Kathleen's trial - although up until then there was no possible trial because Kathleen's death had long before been ruled a suicide. *Id*. at ¶52.

Ruling on the sufficiency of the evidence as to Stacy's FBW statements, the Court misapplied well-established federal precedent as to both attorney and clergy privilege in finding both attorney Smith and Reverend Schori's testimony to not be precluded by same. *Id*. at ¶61-66. Then, in affirming the admission of these statements, the State looked almost entirely to evidence suggesting that Drew caused Stacy's death because he did not want to get divorced (see *Id*. at ¶70-75), before ultimately holding, without explanation:

> Based on the [foregoing] evidence . . . we cannot say that the trial courts finding . . . that [Drew] murdered Stacy, at least in part with the intent to prevent her from reporting to police his involvement in Kathleen's death OR testifying at a reasonably anticipated divorce OR a murder trial, was against the manifest weight of the evidence. The trial courts finding as to intent was not "unreasonable, arbitrary, or not based on the evidence presented." (emphasis added). *Id*. at ¶75.

Additionally, the court seemed to have dispensed entirely with the "highly relevant" evidence of no pending hearing, concluding on the point: "[b]ecause the absence of pending legal proceedings is not a bar to application of the forfeiture by wrongdoing doctrine, the State was not precluded from pursuing its theory." But the fact that it is not a bar does not compel the opposite – presume there would be a proceeding. Indeed, as to Kathleen, the evidence is parallel to *Jensen*, as are the

statements. In regard to Stacy, even if she may have been thinking about leaving, that does not lead to the conclusion there would be a divorce with testimony, or that Drew, the person whose intent is at issue, knew of her plan. As to her testifying in a trial about Kathleen, it was then well settled her death was a suicide. The Court's theory in affirmation inherently hinges upon whether these then-non-existent proceedings were foreseeable; but it would be patently unreasonable to believe that Drew committed a murder in order to avoid testimony at an unforeseeable proceeding.

From all of this, it becomes fairly apparent that the bodies ruling on this issue have simply wished this specific intent into existence in order to allow these statements into a high-pressure trial and to affirm the same. There was no evidence presented from which to reasonably infer that either of these women were killed with the specific intent of preventing their testimony at a legal proceeding or otherwise, as, quite simply, none existed.

The only testimony at all suggesting that Drew acted to prevent Stacy from testifying at a then non-existent murder trial, for the death of a person whose death had been ruled an accident/suicide time and time again, came from attorney Harry Smith, and that testimony should have been precluded as privileged (See *infra*).

Assuming *arguendo* that Drew did exactly what the Illinois Supreme Court seemed to latch onto in its opinion (¶¶70-75 above)—killing someone in order to avoid a divorce, regardless of whether that divorce may have been financially harmful, in no way triggers the FBW doctrine. That is simply not what the doctrine

is for—it was not devised in the common law for any such purpose and it has never once been extended in any such way (absent reversals, of course)—no matter how helpful an alternative application may be to a prosecution.

The FBW doctrine can only be invoked when the prosecution puts forth specific evidence that the defendant intended to make a witness unavailable to testify. No cogent rationale has ever been presented or even argued as to the testimony Drew sought to avoid. As in *Jensen*, a new trial should be granted due to the error from admitting the unconfronted testimonial hearsay of Kathleen and Stacy.

### C. THE ILLINOIS SUPREME COURT'S EXCEPTION—THAT COMMUNICATIONS BETWEEN A LAYPERSON AND AN ATTORNEY, DURING WHICH THE ATTORNEY PROVIDES LEGAL ADVICE, ARE NOT PROTECTED BY ATTORNEY-CLIENT PRIVILEGE IF THE ATTORNEY IS NOT GOING TO BE ABLE TO ENTER INTO FORMAL REPRESENTATION—IS AN UNWARRANTED DISTORTION OF THE LAW OF PRIVILEGE.

The attorney-client privilege exists because it is essential that in seeking advice and assistance from a lawyer, a person is able to share confidences. In this case, the Illinois Supreme Court held that the initial consultation between Attorney Harry Smith and Stacy Peterson, during which Stacy confided that she knew how Peterson murdered Savio, was not privileged. Ex. A at ¶¶ 84, 91. That conclusion was based on the finding that Smith told Savio at some point during the

28

conversation that he "could not represent her." [6]   Ex. A at ¶¶ 62-63.  Thus, the Illinois court drew a bright line, presumably finding it insignificant that regardless of his statement, Smith continued to speak with Savio and offer legal advice.  *Id.* at ¶ 63.

###### i.      The Decisions is a Departure from Well Settled Precedent.

The decision of the Illinois Supreme Court marks a substantial departure from the "principles of the common law" as they have historically been "interpreted by the courts of the United States in the light of reason and experience," *Fed. R. Evid. 501.  See also Ill. R. Evid. 501.*  The Illinois court essentially makes the agreement to engage a lawyer's services an indispensable precondition to cloaking a consultation with the attorney-client privilege.  This novel ruling is contrary to long settled precedent.  The erroneous ruling also undermines the beliefs of laypersons that their communications will remain confidential when they seek the advice of an attorney, even if one is not ultimately retained.  It presents a dangerously slippery slope.

The attorney-client privilege is the oldest of the privileges for confidential communications in common law.  *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981) (citing 8 John Henry Wigmore, *Evidence in Trials at Common Law § 2290* (McNaughton rev. 1961)).  "Its purpose is to encourage full and frank communication between attorneys and their clients."  *Id.*  The privilege is required

---

[6] This quote appears when Smith testified pre-indictment, before the grand jury.  He later testified at a pretrial hearing on a motion to bar the testimony because the discussion was privileged, that said he "may not" be able to represent Stacy.  At trial, he said he "believe[d] there was" a conflict that would have prevented him from representing Stacy.  Ex. C at 141.

because "sound legal advice or advocacy serves public ends," and "such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.* at 389; *see also Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."), and *Fisher v. United States*, 425 U.S. 391, 403 (1976) (holding that the purpose of the privilege is "to encourage clients to make full disclosure to their attorneys"). The privilege even survives death. *Swidler & Berlin v. United States*, 524 U.S. 399 (1998). It is so well settled it is beyond reproach.

Certainly, even when an individual is just a prospective client, the individual is still seeking legal advice from an attorney, who is still acting in that capacity:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or is his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services (iii) assistance in some sort of legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357 (D. Mass. 1950). Under this oft quoted provision, the privilege still applies. The person still "sought to become a client," and the reasons why the consultation did result in representation should be irrelevant. The attorney is still providing legal advice.

When an attorney refuses to act on behalf of the prospective client, he or she "does not need or deserve the protection of the privilege." Wigmore, *supra*, § 2304;

*see also* 1 Kenneth S. Broun et al., <u>McCormick on Evidence</u> *§ 88 n.3* (7th ed. 2013)

("Of course, statements made after the employment is declined are not privileged.");

*People v. Gionis*, 892 P.2d 1199, 1207 (Cal. 1995) (collecting cases and observing

that "authorities in other jurisdictions appear to uniformly hold that the attorney-

client privilege does not protect statements made after an attorney declines

employment").

By providing legal advice, the attorney is not "refusing to act;" he is simply

declining employment. The attorney is still acting in the capacity of an attorney

and communicating as a lawyer. Long ago, our Supreme Court settled what was

required to designate a communication as privileged when the attorney acted in his

capacity as legal counsel, and what was not:

> If he consulted him in the capacity of an attorney, and the
> communication was in the course of his employment, and may be
> supposed to have been drawn out in consequence of the relations of the
> parties to each other, neither the payment of a fee nor the pendency of
> litigation was necessary to entitle him to the privilege.

*Alexander v. United States*, 138 U.S. 353, 358 (1906). Again, the law is well

settled.

Indeed, besides being an outlier, the unreasonably narrow view espoused by

the Illinois court could only have a chilling effect on attorney-client disclosures.

What if the prospective client who seeks advice for a divorce from a divorce

attorney who tells them early in the meeting the matter will be too complex for

them? If the person then continues to ask questions, general ones, is the

conversation unprotected? Or what if the criminal defendant who, after the

attorney tells him he only handles drug cases, shares the details of his/her involvement in a homicide, seeking general legal advice from that attorney?  Should the confession be unprotected when the attorney suggests he cannot represent the prospective client, yet continues to provide legal advice to the prospective client thereafter?  Or what about the too common conversation between layperson and lawyer that begins with, "I am not looking to retain counsel, but I had a few questions . . ."  Should it be left to unretained counsel and the lower courts to litigate this issue?  Of course not, because well settled law says it is privileged, and the decision otherwise is contrary to well established precedent.

### ii.      The Decision Ignores the Purpose of the Privilege.

Contrary to the Illinois court's belief, the privilege must be viewed through the client's lens:

> Clients consult attorneys for a wide variety of reasons, only one of which involves possible criminal liability. Many attorneys act as counselors on personal and family matters, where, in the course of obtaining the desired advice, confidences about family members or financial problems must be revealed in order to assure sound legal advice. The same is true of owners of small businesses who may regularly consult their attorneys about a variety of problems arising in the course of the business. These confidences may not come close to any sort of admission of criminal wrongdoing, but nonetheless be matters which the client would not wish divulged.

> The contention that the attorney is being required to disclose only what the client could have been required to disclose is at odds with the basis for the privilege even during the client's lifetime. In related cases, we have said that the loss of evidence admittedly caused by the privilege is justified in part by the fact that without the privilege, the client may not have made such communications in the first place. See *Jaffe*, 518 U.S. at 12;

> *Fisher v. United States*, 425 U.S. 391, 403, 48 L. Ed. 2d 39, 96 S.
> Ct. 1569 (1976).

*Swidler & Berlin*, 524 U.S. at 407-08.

The attachment of privilege has always begun the moment a prospective client consults with an attorney with the intent of obtaining professional legal advice and is based on the belief and intent of the client, not those of the attorney. In deciding that Stacy would not have believed that her conversation with Smith was privileged because of Smith's own belief a conflict may have existed, the court decimated the concept of attorney-client privilege, without reason. By conditioning its existence on the attorney's subjective belief, the Illinois court has transferred ownership of the privilege from client to attorney. It is aberrant. "Whatever facts, therefore, are communicated by client to a counsel solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent." *Alexander*, 138 U.S. at 358.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, petitioner, Drew Peterson, through his herein signed attorneys, respectfully prays that this Honorable Court of Review:

(a) Enter an Order reversing his conviction for First Degree Murder for which he is in custody and order his release, or remanding this matter to the Will County Trial Court for a new trial;

(b) Permit him, because of his present indigence, to proceed without payment of costs, and

(c) Grant any other relief that may be appropriate.

September 25, 2019

Respectfully Submitted,

/s/ Steven A. Greenberg ,
Steven A. Greenberg
53 W. Jackson Blvd.#1260
Chicago, IL 60604
(312) 399-2711
steve@greenbergCD.com

/s/ Steven A. Greenberg
Steven A. Greenberg

**VERIFICATION**

Pursuant to 28 U.S.C. §1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed September 29, 2019.

Steven Greenberg