**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DREW PETERSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 19-cv-06454 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| T.J. WATSON, Complex Warden, | ) | |
| USP Terre Haute, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Drew Peterson is serving a sentence of 38-years' imprisonment after a jury found him guilty of the first-degree murder of his third ex-wife, Kathleen Savio ("Kathleen"). Peterson's conviction and sentence were affirmed by the Illinois Appellate Court and the Illinois Supreme Court. He has now filed the present petition for a writ of habeas corpus under 28 U.S.C. § 2254(d), arguing that the Illinois Supreme Court unreasonably applied United States Supreme Court precedent and made erroneous factual determinations in rejecting his ineffective assistance of counsel claim and his challenges to the state trial court's admission of certain evidence. (Dkt. No. 1.) For the reasons that follow, Peterson's petition for a writ of habeas corpus is denied.

**BACKGROUND**

When reviewing a habeas petition, the Court "must accept the factual findings of the state trial and appellate courts as true because they are entitled to a presumption of correctness." *Ford v. Ahitow*, 104 F.3d 926, 928 (7th Cir. 1997). Therefore, the facts here are taken from the Illinois Supreme Court and Illinois Appellate Court decisions affirming Peterson's conviction. *See People v. Peterson*, 106 N.E.3d 944 (Ill. 2017); *People v. Peterson*, 47 N.E.3d 1005 (Ill. App. Ct. 2015).

## I.  Kathleen's Death

During their marriage, Peterson and Kathleen lived with their two sons in Bolingbrook, Illinois, where Peterson worked as a police officer. After being married for about ten years, Peterson and Kathleen each filed a petition for dissolution of the marriage in early 2002. Their petitions were consolidated and the proceeding was bifurcated such that their marriage was dissolved on October 10, 2003, with issues of child custody, child support, and division of marital assets to be determined at a hearing scheduled for April 6, 2004.

Shortly before that hearing, on February 29, 2004, Peterson brought the couple's sons back to Kathleen's home after their weekend visitation, but Kathleen did not come to the door and could not be reached. The next evening, Peterson sought assistance from a locksmith and four of Kathleen's neighbors to enter Kathleen's home. Two of the neighbors discovered Kathleen's lifeless body in the master bathroom's bathtub. Upon hearing one of the neighbor's screams, Peterson ran into the bathroom where he took Kathleen's pulse and confirmed that she was dead. Illinois State Police investigated Kathleen's death and an autopsy concluded that she had drowned but did not otherwise determine the manner of her death. A coroner's inquest later found that Kathleen's manner of death was accidental. Following Kathleen's death, a final judgment was entered in the couple's divorce, awarding Peterson sole custody of their two sons and resolving the remaining financial issues in his favor.

Peterson had remarried prior to Kathleen's death, but by October 2007, he and his new wife, Stacy Cales ("Stacy"), were themselves on the verge of divorce. On October 28, 2007, Stacy's sister reported her missing. Stacy's disappearance led to renewed interest in Kathleen's death. In November 2007, Kathleen's body was exhumed, and two subsequent autopsies concluded that Kathleen's manner of death was actually homicide rather than accident. A grand

jury subsequently indicted Peterson on charges of first-degree murder in connection with Kathleen's death.

## II.    Pre-Trial Proceedings

The state trial court commenced a pre-trial hearing in January 2010 to address the State's motion seeking the admission of fourteen hearsay statements made by Kathleen and Stacy, under both an Illinois statutory hearsay exception and the common-law doctrine of forfeiture by wrongdoing. The state trial court admitted certain of the contested statements while excluding others, and the ruling resulted in protracted appellate litigation concerning the interplay between the statutory hearsay exception and the forfeiture-by-wrongdoing doctrine not relevant here. Ultimately, the Illinois Appellate Court ruled that all fourteen statements were admissible under the common-law doctrine of forfeiture by wrongdoing because the State had proved that Peterson killed Kathleen and Stacy with the intent to make them unavailable as witnesses. At the same time, the Appellate Court acknowledged that, on remand, the trial court could still find that the statements were inadmissible for some other reason.

On remand to the trial court, further pre-trial proceedings were held on the parties' various motions in limine. One motion filed by Peterson challenged hearsay statements that Kathleen and Stacy had separately made to the same attorney, Harry Smith. Peterson claimed that those statements were protected by the attorney-client privilege. The trial court agreed that Stacy's statements were protected by the attorney-client privilege and excluded them. However, it found that Kathleen had waived the privilege and therefore her statements to Smith were admissible.

## III.    Trial

Peterson's seven-week jury trial began in July 2012. The State presented evidence that there were bruises and abrasions on Kathleen's body and a laceration to her scalp consistent with

a struggle rather than an accidental fall in the bathtub. One of the State's witnesses testified that Peterson offered him $25,000 for assistance in finding a man to "take care of his third wife"—Kathleen—about four months before her death. In addition, the State introduced evidence showing that Peterson had threatened Kathleen's life on several occasions and claimed that he could kill her and make it look like an accident. That evidence included handwritten statements made by Kathleen to the police and the Will County State's Attorney's office recounting a July 2002 incident when Peterson broke into Kathleen's home, pinned her to the stairs for over three hours, and threatened her with a knife.

The State also called as a witness Neil Schori, a pastor who had previously counseled Peterson and Stacy. Schori testified about a meeting he had with Stacy at a Bolingbrook coffee shop in late August 2007. At some point during their conversation, Stacy became visibly upset and told Schori that she had something to tell him about the night Kathleen died. Stacy told Schori that she woke up in the middle of the night and discovered that Peterson was not at home nor was he reachable by phone. Sometime in the early morning hours, Stacy observed Peterson near the washer and dryer dressed in all black and carrying a bag. Peterson then removed from the bag women's clothes that did not belong to Stacy and placed them in the washer. Stacy also told Schori that Peterson advised her that the police would want to speak to her about Kathleen's death and coached her on what to say to them.

Despite the trial court's pre-trial ruling barring the State from calling Smith (the attorney) to testify about statements Stacy made to him, Peterson opted to call Smith as a defense witness. Smith testified about a phone call he had with Stacy in October 2007. Stacy had initiated the call for the purpose of retaining Smith to represent her in divorce proceedings against Peterson. While Smith told Stacy that he could not represent her due to a conflict of interest, Smith did entertain

questions from Stacy concerning the divorce. During the course of their conversation, Stacy asked if she could obtain more money from Peterson if she threatened to tell the police about how Peterson killed Kathleen. She told Smith that "she had so much S-H-I-T on [Peterson] at the police department that he couldn't do anything to her." On cross-examination, Smith affirmed that Stacy sought to get more money out of Peterson by threatening to tell the police exactly "how" Peterson killed Kathleen.

At the close of trial, the jury found Peterson guilty of the first-degree murder of Kathleen. The trial court subsequently sentenced Peterson to 38 years' imprisonment. Both the Illinois Appellate Court and the Illinois Supreme Court affirmed Peterson's conviction and sentence, and the United States Supreme Court denied his petition for a writ of certiorari. Peterson did not file any collateral challenge to his conviction in state court.

## DISCUSSION

Peterson now seeks federal habeas relief under 28 U.S.C. § 2254(d). That statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), does not allow an individual in custody pursuant to a state court judgment to obtain a writ of habeas corpus unless

> the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In the present matter, Peterson seeks relief pursuant to both subsections of § 2254(d). Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law when "the state court applies a rule different from the governing law set forth in Supreme Court cases."

*McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011) (internal quotation marks and alterations omitted). Alternatively, a state court decision constitutes an "unreasonable application" of clearly established federal law where "the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case." *Id.* (internal quotation marks and alterations omitted). "The focus of the reasonableness inquiry is on whether the state court's application of clearly established federal law is ***objectively unreasonable***, not whether it applied clearly established federal law correctly." *Id.* Thus, "a habeas court must first determine what arguments or theories could have supported the state court's decision and then ask if fairminded jurists could disagree about whether those arguments or theories are inconsistent with Supreme Court holdings." *Id.*

A state court decision is based on an unreasonable determination of the facts within the meaning of § 2254(d)(2) "if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018) (internal quotation marks omitted). However, a state court's factual determinations may not be deemed unreasonable simply because the habeas court "would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015). Rather, the state court is entitled to substantial deference. *Id.* at 314. "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (internal quotation marks and alteration omitted).

In undertaking the AEDPA analysis, the habeas court considers "the decision of the last state court to rule on the merits of the petitioner's claim." *McCarthy*, 656 F.3d at 483. Here, that is the Illinois Supreme Court's decision affirming Peterson's conviction and sentence. *Peterson*, 106 N.E.3d 944. Peterson challenges the Illinois Supreme Court's rejection of his claim of ineffective

assistance of counsel, its determination that Kathleen and Stacy's hearsay statements were admissible under the forfeiture-by-wrongdoing doctrine, and its refusal to exclude Stacy's statements to Smith on the basis of attorney-client privilege.

## I. Ineffective Assistance of Counsel

According to Peterson, his trial counsel's decision to call Smith as a witness to testify that Stacy told him that Peterson killed Kathleen and that she knew how he did it was "on the Mount Rushmore of boneheaded moves." Yet the Illinois Supreme Court found that the decision, although unsuccessful, was within the realm of reasonable trial strategy. Peterson claims that this conclusion was contrary to and an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

The Sixth Amendment guarantees a criminal defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Moreover, the Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The clearly established federal law governing ineffective assistance of counsel claims is set forth in *Strickland*. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). In particular, to demonstrate ineffective assistance of counsel, a habeas petitioner must satisfy *Strickland*'s two-prong test. *Campbell v. Reardon*, 780 F.3d 752, 762 (7th Cir. 2012). "First, he must show that counsel provided constitutionally deficient performance and second, he must show that this deficient performance prejudiced his defense. Failing to prove either element defeats a petitioner's claim." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (internal quotation marks and citation omitted). To show that counsel was deficient, a petitioner "must identify acts or omissions by counsel that fell below an objective standard of reasonableness and could not

have been the result of professional judgment." *Campbell*, 780 F.3d at 762. However, a habeas

court "must apply a 'strong presumption' that counsel's representation was within the 'wide

range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011)

(quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation

amounted to incompetence under 'prevailing professional norms,' not whether it deviated from

best practices or most common custom." *Id.* at 105 (quoting *Strickland*, 466 U.S. at 690).

To satisfy the prejudice prong, a petitioner "must demonstrate a reasonable probability

that, but for counsel's unprofessional errors" the outcome would have been different. *Id.* at 104

(internal quotation marks omitted). But he must do more than "show that the errors had some

conceivable effect on the outcome" and instead demonstrate that his counsel's errors were "so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* A petitioner

seeking habeas relief for ineffective assistance of counsel "faces a high hurdle," as the habeas

court is to employ a "doubly deferential" standard that "gives both the state court and the defense

attorney the benefit of the doubt." *Hicks v. Hepp*, 871 F.3d 513, 526 (7th Cir. 2017) (internal

quotation marks omitted).

Here, Peterson claims that his trial counsel provided constitutionally deficient performance

when he decided to call Smith to testify about his meeting with Stacy and elicit testimony that was

akin to a confession of Peterson's guilt. In analyzing Peterson's ineffective assistance of counsel

claim, the Illinois Supreme Court correctly applied the *Strickland* two-prong test. Therefore, its

rejection of that claim was not contrary to clearly established federal law. Nonetheless, Peterson

asserts that the Illinois Supreme Court's conclusion that his counsel's choice to call Smith was

strategic was an unreasonable factual determination and its conclusion that his counsel's choice

was not objectively unreasonable was an unreasonable application of *Strickland*.

This Court agrees with the Illinois Supreme Court that Peterson's counsel's decision to call Smith as a witness was a strategic decision within the wide range of reasonable professional assistance. As the Illinois Supreme Court noted, the trial record demonstrated that counsel's strategy in calling Smith was to attack Stacy's credibility by showing that Stacy had a motive to fabricate her claim that Peterson was involved in Kathleen's death. *Peterson*, 106 N.E.3d at 969. Where "an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel." *United States v. Lathrop*, 634 F.3d 931, 937 (7th Cir. 2011) (internal quotation marks omitted). A sound strategy is one "that secures for the accused the benefit of an adversarial process." *Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000). Generally, an attorney's strategic decision to call or not call a witness is not subject to review. *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997).

Before Smith was called as a witness, the jury had already heard Schori testify that Stacy had told him that Peterson was not at home the night of Kathleen's murder and when she saw him in the early morning hours, he was dressed in all black and putting another woman's clothes in the washer. Stacy also told Schori that Peterson coached her on what to say to police when they interviewed her about Kathleen's death. Counsel tried to cast doubt on the veracity of Stacy's claims in Schori's cross-examination. For example, Peterson's counsel repeatedly asked Schori whether he believed Stacy's story, and if he did, questioned him as to why he did not try and prevent her from returning home to a murderer. Yet Schori maintained that he believed Stacy was being truthful.

Knowing that Stacy's damning recollection of the night of Kathleen's death would be before the jury, Peterson's counsel could have let the matter rest and hope the jury disbelieved

Schori's testimony. Alternatively, he could try again to undermine Stacy's credibility by calling Smith to testify about his consultation with Stacy. Certainly, Smith's testimony that Stacy told him that Peterson killed Kathleen and that she knew how he did it was a more direct accusation of guilt than the statements Stacy made to Schori. At the same time, Smith only testified that Stacy said that Peterson killed Kathleen without providing further details, despite Stacy's claim that she knew how Peterson did it. More importantly, Smith's testimony contained details that cast doubt on Stacy's overall credibility. Specifically, Smith testified that Stacy asked him whether the fact that Peterson killed Kathleen could give her an advantage in their divorce and whether Stacy could get more money from Peterson if she threatened to tell the police that he killed Kathleen. The value of such testimony is apparent, as it would allow Peterson's counsel to portray Stacy as dishonestly fabricating stories of Peterson's culpability for Kathleen's death as leverage in the couple's anticipated divorce. Counsel could reasonably believe that a jury might be disinclined to believe the statements of a woman who appeared less concerned about the fact that her husband murdered his ex-wife than about how she could use his wrongdoing to her financial advantage. Thus, the Court finds that it was within the realm of reasonable trial strategy for Peterson's counsel to determine that the benefit of calling Smith to elicit the discrediting statements outweighed the cost of also eliciting Stacy's bare-bones accusation against Peterson. Like the Illinois Supreme Court, the Court agrees that this strategy was not objectively unreasonable even though it proved unsuccessful.

Having concluded that Peterson's trial counsel's performance was not constitutionally deficient, the Illinois Supreme Court had no need to address whether Peterson was prejudiced by his counsel's errors. This Court could similarly deny Peterson habeas relief without addressing the

prejudice prong. Nonetheless, the Court will briefly address whether the outcome of Peterson's trial would have been different had his counsel not called Smith.[1]

The Court finds that Peterson was not prejudiced by Smith's testimony. While Schori did not testify that Stacy had directly told him that Peterson killed Kathleen, the clear implication of her testimony was that Peterson was responsible for Kathleen's death. And unlike the testimony elicited from Smith, Schori's testimony contained details of Stacy's direct observations. Moreover, the jury heard evidence that Peterson offered a man $25,000 to find someone to "take care of" Kathleen months before she died. And numerous witnesses testified about Peterson's history of abusing and threatening Kathleen. Even without hearing through Smith that Stacy directly accused Peterson of killing Kathleen, the jury still had ample evidence supporting its guilty verdict. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Therefore, to the extent the decision by Peterson's counsel's to call Smith was constitutionally deficient, it did not prejudice Peterson.

In short, the Court finds that the Illinois Supreme Court did not make an unreasonable factual determination in light of the evidence or unreasonably apply *Strickland* in holding that Peterson did not receive ineffective assistance of counsel. Moreover, even if the decision by Peterson's counsel to call Smith as a witness was objectively unreasonable, it did not prejudice Peterson. For that reason, the Court denies Peterson's habeas claim of ineffective assistance of counsel.

---

[1] Because the Illinois Supreme Court did not address the prejudice prong, the Court reviews that prong *de novo* rather than under AEDPA's deferential standard. *Thomas v. Clements*, 789 F.3d 760, 766–67 (7th Cir. 2015).

## II.     Forfeiture by Wrongdoing

Next, Peterson contends that he is entitled to habeas relief because the trial court violated his rights under the Sixth Amendment's Confrontation Clause by admitting Kathleen and Stacy's hearsay statements under the forfeiture-by-wrongdoing doctrine. The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Under the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

One of the recognized exceptions to the Confrontation Clause is the forfeiture-by-wrongdoing doctrine, which "extinguishes confrontation claims on essentially equitable grounds." *Id.* at 62. Under the doctrine, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813, 833 (2006). However, the United States Supreme Court has made clear that forfeiture occurs "only when the defendant engaged in conduct ***designed*** to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359 (2008). Put differently, "testimonial hearsay statements for which no other exception applies should be excluded if 'the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder cases involving accusatorial statements by the victim.'" *Jensen v. Clements*, 800 F.3d 892, 899 (7th Cir. 2015) (quoting *Giles*, 554 U.S. at 361).

As an initial matter, the Court notes that there is a substantial question as to whether the Confrontation Clause even applies to many of the statements at issue here. The forfeiture-by-wrongdoing doctrine refers not only to an exception to the Confrontation Clause but also an

exception to the rule against hearsay. *Davis*, 547 U.S. at 833. While the Illinois Supreme Court's analysis was consistent with *Giles*, there is no doubt that it was discussing the forfeiture-by-wrongdoing doctrine's use as a hearsay exception. Indeed, the Illinois Supreme Court expressly stated that it was interpreting Illinois Rule of Evidence 804(b)(5), which codifies the common-law doctrine of forfeiture by wrongdoing as a hearsay exception. *See Peterson*, 106 N.E.3d at 953–59. By contrast, where the forfeiture-by-wrongdoing doctrine acts as a Confrontation Clause exception, it applies only to testimonial statements. *Giles*, 554 U.S. at 376 ("[O]nly ***testimonial*** statements are excluded by the Confrontation Clause."). But "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Crawford*, 541 U.S. at 68. In such circumstances, state courts are free to interpret their forfeiture-by-wrongdoing doctrine differently from the standard set in *Giles*. *See Giles*, 554 U.S. at 376 (noting that where nontestimonial statements are at issue, they may "be excluded, if at all, only by hearsay rules, which are free to adopt the dissent's version of forfeiture by wrongdoing"). Thus, if the Illinois Supreme Court's interpretation of the forfeiture-by-wrongdoing hearsay exception was inconsistent with *Giles*, habeas relief will only be available if the admitted statements were testimonial and thus subject to the Confrontation Clause. *See Fieldman v. Brannon*, 969 F.3d 792, 800 ("Run-of-the-mill state law errors usually do not provide a basis for federal habeas relief because a habeas petitioner may obtain relief only if a state court rendered a decision 'in violation of the Constitution or laws or treaties of the United States.'" (quoting 28 U.S.C. § 2254(a)).

While the State failed to raise the issue, the Court cannot ignore that most of the statements at issue here appear to be nontestimonial. The United States Supreme Court continues to elaborate upon what statements are properly deemed testimonial, but in *Giles*, it explained that

"statements to friends and neighbors about abuse and intimidation" would not qualify. *United States v. Norwood*, 982 F.3d 1032, 1043 (7th Cir. 2020) (quoting *Giles*, 554 U.S. at 376). And here, it is evident that many of the statements at issue were statements Kathleen and Stacy made to friends and neighbors. For example, Peterson challenges the admission of Stacy's statements to Schori, as well as statements Kathleen made to friends and family about Peterson's threats. However, there are at least two statements that appear to be testimonial: a letter Kathleen wrote to the Will County State's Attorney's Office and a handwritten statement she made to police. *See Davis*, 547 U.S. at 822 (explaining that statements made in the course of police interrogation are testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"); *see also United States v. Brown*, 822 F.3d 966, 974 (7th Cir. 2016) ("Testimonial statements are formal statements to government officers, or formalized testimonial materials such as affidavits, depositions, and the like, that are destined to be used in judicial proceedings.").[2] Indeed, the Illinois Supreme Court noted that *some* of Kathleen's hearsay statements might be testimonial but found that its holding that the statements were admissible under the forfeiture-by-wrongdoing hearsay exception made it unnecessary to address any confrontation issues. *Peterson*, 106 N.E.3d at 963 n.4. Thus, given that some of the challenged statements are likely testimonial and the State's failure to raise the issue, the Court proceeds to address the merits of Peterson's Confrontation Clause arguments.

---

[2] For present purposes, the Court finds only that, of the challenged hearsay statements, Kathleen's two statements to law enforcement come closest to qualifying as testimonial. Whether the statements are, in fact, testimonial requires an analysis of whether the statements' primary purpose was testimonial. *Ohio v. Clark*, 576 U.S. 237, 245 (2015). Because the parties did not brief the issue, the Court makes no definitive determination of whether Kathleen's statements to law enforcement were testimonial.

According to Peterson, the Illinois Supreme Court unreasonably applied *Giles* by admitting Kathleen's and Stacy's hearsay statements without specifically identifying the testimony that Peterson sought to prevent by killing them. Yet Peterson can point to no United States Supreme Court case stating that a trial court must identify the testimony the defendant seeks to avoid before admitting statements under the forfeiture-by-wrongdoing doctrine. Indeed, the United States Supreme Court has largely avoided addressing the procedural issues surrounding the doctrine—it has not even taken a position on the standard of proof governing admissibility of forfeited statements.[3] *See Davis*, 547 U.S. at 833 ("We take no position on the standards necessary to demonstrate such forfeiture . . . ."). As of the date of the Illinois Supreme Court's decision, *Giles* simply stood for the broad proposition that unconfronted testimonial statements are admissible under the forfeiture-by-wrongdoing doctrine only upon "a showing that the defendant intended to prevent a witness from testifying." *Giles*, 554 U.S. at 361; *see also Cullen*, 563 U.S. at 182 ("State-court decisions are measured against this Court's precedents as of the time the state court renders its decision." (internal quotation marks omitted)). It left the finer points of implementing that principle to the lower courts in the first instance. *See United States v. Ledbetter*, 141 F. Supp. 3d 786, 791 (S.D. Ohio 2015) ("Because *Giles* did not declare the proper procedures for adjudicating forfeiture-by-wrongdoing claims, this Court maintains discretion over ***how*** and ***when*** to make those determinations.").Thus, there is no basis for Peterson's contention that there was a clearly established requirement that the trial court specifically identify the testimony he sought to prevent by procuring the unavailability of a witness.

---

[3] Although it took no position on the standard necessary to show forfeiture, the United States Supreme Court did observe with seeming approval that federal courts apply a preponderance-of-the-evidence standard when using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture-by-wrongdoing hearsay exception. *Davis*, 547 U.S. at 833.

Next, Peterson challenges the Illinois Supreme Court's factual determination that Peterson killed both Kathleen and Stacy with the intent of preventing them from testifying. The Illinois Supreme Court's finding that Peterson acted with the requisite intent is a factual determination that, on habeas review, Peterson must contradict by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "But if the state court's finding is supported by the record . . . then it is presumed to be correct." *Mendiola v. Schomig*, 224 F.3d 589, 592–93 (7th Cir. 2000). Before evaluating that determination, the Court notes that the law is at least unsettled as to whether a defendant must act with the sole intent of preventing a witness from testifying or whether forfeiture applies even when a defendant has multiple motivations for his wrongdoing. *See, e.g.*, *United States v. Jackson*, 706 F.3d 264, 269 (4th Cir. 2013) (finding that the forfeiture-by-wrongdoing exception applies even when a defendant has multiple motivations for harming a witness). Similarly, it is not settled whether the exception applies only where the defendant prevents a witness from testifying at a certain type of proceeding (*e.g.*, criminal) or one presently in progress. *See, e.g.*, *Giles*, 554 U.S. at 377 (observing that conduct designed to prevent a domestic violence victim from reporting abuse to authorities would render her statements admissible under the forfeiture doctrine); *United States v. Burgos-Montes*, 786 F.3d 92, 115 (1st Cir. 2015) ("[T]he forfeiture-by-wrongdoing exception is available for statements by a witness who was murdered before charges were brought if it was reasonably foreseeable that the investigation would culminate in the bringing of charges." (internal quotation marks omitted)). Given the lack of clearly established law on these points, the relevant factual determination on habeas review is whether one of Peterson's motivations for killing Kathleen and Stacy was to prevent each from testifying in some present or future legal proceeding.

First, as to Kathleen, the Illinois Supreme Court found that there was evidence showing that Peterson murdered her to prevent her from testifying at the April 2004 hearing in their bifurcated divorce, which was to address issues regarding the division of assets and custody. It noted the evidence showing that Peterson and Kathleen were fighting over money and that Peterson was particularly concerned with preventing Kathleen from receiving any part of his pension. Kathleen was also fighting hard to retain custody of the couple's sons. The Illinois Supreme Court further found that Peterson's statement that he needed to have his "third wife taken care of" because she "has something on me" was indicative of Peterson's intent to prevent Kathleen from testifying in the divorce proceeding. Because Kathleen was unable to appear at the April hearing, the financial and custody issues were all resolved in Peterson's favor. Thus, the Illinois Supreme Court concluded that there was sufficient record support for the trial court's finding that the State had proved Peterson killed Kathleen to prevent her from testifying. While Peterson contends that the above evidence does not demonstrate any motive for Peterson to want to avoid Kathleen's testimony, this Court cannot agree. To the contrary, the record suggests that had Kathleen testified at the April hearing, certain matters in the couple's divorce would have been resolved in her favor, a result Peterson could and did avoid by procuring Kathleen's absence from that hearing.

Peterson cites *Jensen v. Schwochert*, No. 11-C-0803, 2013 WL 6708767, at *8 (E.D. Wis. Dec. 18, 2013), *aff'd sub nom. Jensen v. Clements*, 800 F.3d 892, to argue that the forfeiture-by-wrongdoing doctrine does not apply where the defendant's intent is "to avoid a messy divorce." There, the district court rejected the State's contention that forfeiture applied when one reason the petitioner killed his wife was "to avoid any litigation surrounding a divorce or custody dispute involving their two children." *Id.* But *Jensen* is inapposite because the petitioner there purportedly

caused his wife's death "not to prevent her from testifying at a divorce but to eliminate any need for a divorce." *Id.* at *9. Notably, the district court did not outright reject the possibility that an intent to prevent testimony at divorce proceedings could suffice for forfeiture-by-wrongdoing purposes. Instead, its holding rested on the fact that neither the petitioner nor his wife were actually pursuing or planning to pursue a divorce at the time of the wife's death. *Id.* By contrast, here, Peterson and Kathleen's divorce was ongoing at the time of Kathleen's death and Kathleen was just weeks away from testifying in a critical proceeding in that matter.[4]

As to Stacy, the Illinois Supreme Court found that Peterson murdered her to prevent her from reporting Peterson's involvement in Kathleen's murder to the police or testifying at a reasonably anticipated divorce hearing or murder trial. Again, the Court finds this determination supported by the evidence. Smith's and Schori's testimony demonstrated that Stacy was actively considering reporting her knowledge of Peterson's involvement in Kathleen's death to the authorities. Further, there was evidence showing that Peterson suspected that Stacy had told one of his sons that he had killed Kathleen and had begun actively monitoring her whereabouts. And in *Giles*, the Supreme Court expressly stated that where evidence supported "a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution," the victim's prior testimonial statements are admissible under the forfeiture-by-wrongdoing doctrine. *Giles*, 554 U.S. at 377. Thus, this Court finds that the record sufficiently supports the Illinois Supreme Court's determination that Peterson killed Stacy to prevent her from testifying about his involvement in Kathleen's death. That is sufficient to show Peterson's intent and obviates the need to consider whether Peterson's

---

[4] The Court also finds *Jensen* of limited persuasive value because the district court did not analyze whether the admission of the challenged hearsay statements violated the petitioner's confrontation rights under AEDPA's standard. Instead, its review was *de novo* because the state court assumed a constitutional violation and did not actually reach the Confrontation Clause issue. *Jensen*, 2013 WL 6708767, at *7.

intent to prevent Stacy from testifying at anticipated but not-yet existent divorce proceedings also supported forfeiture.

Thus, assuming that Kathleen and Stacy's hearsay statements were testimonial, the Illinois Supreme Court's decision affirming their admission was consistent with the United States Supreme Court's Confrontation Clause precedents. Moreover, there was sufficient evidentiary support for the Illinois Supreme Court's determination that Peterson procured both Kathleen and Stacy's unavailability as witnesses intending, at least in part, to prevent their testimony. For that reason, the Court denies Peterson's request for habeas relief predicated on a violation of his confrontation rights.

### III.  Attorney-Client Privilege

Finally, Peterson seeks habeas relief due to the Illinois Supreme Court's admission of Smith's testimony concerning his consultation with Stacy. Peterson claims that the trial court should have not allowed Smith to testify about what Stacy told him, even as a witness in Peterson's defense, because it had already concluded that his discussion with Stacy was protected by the attorney-client privilege. However, the Illinois Supreme Court found that the privilege was inapplicable because there was never an attorney-client relationship between Stacy and Smith.

This Court concludes that any error in the Illinois Supreme Court's decision concerning the inapplicability of the attorney-client privilege does not furnish a basis for habeas relief. "Even if a violation of the attorney-client privilege occurred, this violation alone would be insufficient grounds for [habeas] relief. The attorney-client privilege is a creation of the common law, not the Constitution" and violation of the privilege is not a violation of the United States Constitution or its laws and treaties as required by § 2254. *Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir.

1989). For that reason, Peterson's claim for habeas relief in connection with the admission of purportedly privileged statements is denied.

### IV.     Certificate of Appealability

Having denied Peterson's habeas petition, the Court must determine whether Peterson is entitled to a certificate of appealability. Rule 11(a) of the Rules Governing Section 2254 Cases requires a habeas court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to "show that reasonable jurists could debate whether (or, for that matter, agree that), the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). While Rule 11(a) of the Rules Governing Section 2254 Cases permits the habeas court to direct the parties to submit arguments on whether a certificate of appealability should issue, the Court does not find that step necessary here. Instead, the Court finds that none of the issues raised in Peterson's habeas petition present a close call under AEDPA's highly deferential standard of review. For that reason, the Court denies Peterson a certificate of appealability.

## CONCLUSION

For the foregoing reasons, Peterson's petition for a writ of habeas corpus (Dkt. No. 1) is denied and he is also denied a certificate of appealability.

ENTERED:

Dated:  June 18, 2021

_____
Andrea R. Wood
United States District Judge